UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

Case Number 25-20742
Honorable David M. Lawson

SHANE LUXON,

Defendant.
_______________________________________/

**OPINION AND ORDER DENYING MOTION FOR EVIDENTIARY HEARING**

Defendant Shane Luxon was charged with unlawfully possessing a firearm as a convicted felon after the Detroit police obtained a search warrant from a state magistrate, searched his house, and found a gun. Luxon has filed a motion asking for a hearing where he can cross-examine the officer who signed the search warrant affidavit, alleging that some of the statements he made are false. Such hearings are allowed under *Franks v. Delaware*, 438 U.S. 154 (1978), if the defendant can make a substantial preliminary showing that the affiant made the targeted statements intentionally knowing that they were false or with reckless disregard for the truth, and that the statements mattered to the probable cause determination. Because Luxon's showing falls short on both counts, the Court will deny the motion for an evidentiary hearing.

I.

According to information given by the government at a bail review hearing, Livonia police officers had been conducting an undercover operation and went to a location on Hubbell Street in Detroit in August of last year to remove a GPS tracker from a vehicle parked there. While they were doing that, a man opened a window in the second story of an adjacent home and began yelling at the officers. They heard a sound that they believed was the loading of a firearm and ran away.

A shot was fired. The officers proceeded to the Detroit Police Department's second precinct station.

On August 25, 2025, Sergeant John Kiousis of the Detroit Police Department submitted an affidavit in support of his request to search the residence at 13280 Hubbell Street in Detroit, Michigan, which Luxon acknowledges is his home. In the first paragraph of the affidavit, Sgt. Kiousis averred that an individual on the second floor of the residence opened a window, shouted something, and "fired one shot from a handgun, in the direction of" two undercover Livonia police officers. He wrote:

> On 8/25/25 at 12:17am, officers from Livonia Police Department's Narcotics Unit, Sergeant Holznagle, Sergeant Zelinski and Police Officer Reinholtz, were conducting an undercover operation outside the location of 13280 Hubbell St. in the City of Detroit, County of Wayne. While at the location an unknown male opened the upstairs window of the location, shouted at the undercover officers and fired one shot from a handgun, in the direction of Sergeant Zelinski and Police Officer Reinholtz. The officers fled the location and arrived at the Second Precinct.

ECF No. 34-2, PageID.156.

At 12:24 a.m., according to the affidavit, Detroit police officer Abbas Alsaedi arrived at Luxon's home and spoke with him. Luxon confirmed that "he had seen someone outside by his car and opened the upstairs window and shouted at them." *Ibid.* The City of Detroit's "ShotSpotter" technology also indicated that a shot had been fired at the location of the residence just before 12:17 a.m., approximately the same time that the Livonia police officers purportedly were fired upon. *Ibid.* A criminal background check conducted through a state database also revealed that Luxon had prior felony convictions in a Michigan state court, prohibiting him from possessing firearms. *Ibid.* Kiousis's affidavit concluded that he believed that a search of the premises would lead to the discovery of firearms or ammunition illegally in the defendant's possession. *Ibid.*

Based on the facts averred in Kiousis's affidavit, a magistrate in Detroit's 36th District Court signed a warrant authorizing a search of the defendant's residence for firearms, ammunition, firearms accessories, and proof of residency or ownership of the residence, for the purpose of investigating potential crimes of "Felonious Assault and Felon in Possession of a Firearm." *Id.* at PageID.155. The government represents that, upon searching the residence, officers "found an unloaded .32 caliber revolver, a spent .22 caliber shell casing, and surveillance equipment" in Luxon's upstairs bedroom. ECF No. 37, PageID.278.

In early September 2025, two assistant United States attorneys and an agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) interviewed the three Livonia police officers who were present when the shot allegedly was fired from the defendant's home. According to the summaries of the interviews that were produced by the government, the firsthand accounts of the officers are consistent with the facts described in paragraph one of the search warrant affidavit, except for a couple details discussed below. The three officers were near Luxon's house on Hubbell Street on the night of August 25 in connection with the undercover operation. Sgt. Anthony Zelinski recalled that "a male opened a second story window of the home and began yelling at the officers." ECF No. 34-4, PageID.159. Officer Justin Reinholtz, who was under a vehicle retrieving the GPS tracker, also heard the yell. ECF No. 34-3, PageID.157. Zelinski and Reinholtz heard a "racking" sound similar to a firearm being loaded, began running away, and heard a gunshot while they were running. *Ibid.*; ECF No. 34-4, PageID.159-60. A report prepared by Officer Reinholtz later in the day states that he heard the gunshot coming from the residence. ECF No. 37-3, PageID.296. Sgt. Kyle Holtznagle, who remained in his car during the operation, heard running, yelling, and a gunshot. ECF No. 34-5, PageID.161. All three officers went to Detroit Police Department's second precinct after the incident. *Ibid.*

Absent from any of the officers' accounts of the incident, however, is any assertion that the shot was fired "in the direction of" Sgt. Zelenski and Officer Reinholtz or was fired by the same person who shouted at the officers, as Sgt. Kiousis averred in his search warrant affidavit. *See* Affidavit, ECF No. 34-2, PageID.156. None of the officers stated in their ATF interviews that the shot was fired in any particular direction, and none of them claimed to have seen the shooter fire the gun. In a bail hearing in this case, the government seemed to concede that it did not possess any evidence establishing the direction in which the shot was fired. ECF No. 27, PageID.56 ("I don't think there has been any information that is going to be able to say, specifically, whether the shot was fired in the air or in the direction of the officers.").

On October 1, 2025, a federal grand jury charged Luxon with unlawful possession of a .32 caliber revolver in violation of 18 U.S.C. § 922(g)(1). He filed the present motion for an evidentiary hearing on December 1, 2025.

II.

Well established Fourth Amendment jurisprudence endorses a preference for search warrants before law enforcement officials may search a person's dwelling. *Georgia v. Randolph*, 547 U.S. 103, 117 (2006) (acknowledging "the law's general partiality toward 'police action taken under a warrant [as against] searches and seizures without one'") (quoting *United States v. Ventresca*, 380 U.S. 102, 107 (1965)); *see also United States v. Lefkowitz*, 285 U.S. 452, 464 (1932) ("[T]he informed and deliberate determinations of magistrates empowered to issue warrants as to what searches and seizures are permissible under the Constitution are to be preferred over the hurried action of officers."), *abrogated on other grounds by Harris v. United States*, 331 U.S. 145 (1947), *as recognized in Arizona v. Gant*, 556 U.S. 332, 350 (2009). The Founders believed that inserting a neutral and detached judicial officer between the police and the citizens would promote

the values that are enshrined in the Fourth Amendment. *Johnson v. United States*, 333 U.S. 10, 14 (1948) ("[The Fourth Amendment's] protection consists in requiring that those inferences [supporting probable cause] be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime."). A search warrant may issue if the magistrate finds probable cause to believe that particular evidence of a crime will be found in the place to be searched. *United States v. Grubbs*, 547 U.S. 90, 95 (2006). That finding must be based on information furnished by an affiant under oath. And "when the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a *truthful* showing." *United States v. Halsey*, 257 F. Supp. 1002, 1005 (S.D.N.Y. 1966) (quoted in *Franks v. Delaware*, 438 U.S. 154, 164-65 (1978)). "Because it is the magistrate who must determine independently whether there is probable cause, it would be an unthinkable imposition upon his authority if a warrant affidavit, revealed after the fact to contain a deliberately or reckless false statement, were to stand beyond impeachment." *Franks*, 438 U.S. at 165 (citations omitted).

Luxon argues that Sgt. Kiousis knowingly or recklessly swore to a false statement in his affidavit supporting the search of the defendant's home when he averred that a person fired a shot "in the direction of" the Livonia police officers from the second-floor window of his house. Luxon asserts that none of the officers who were present when the shot was fired saw its trajectory or saw the defendant firing a weapon. He further argues that the alleged false statements affected the magistrate's probable cause finding because they were included in the affidavit that the magistrate relied on in issuing the warrant. All of this, he says, entitles him to an evidentiary hearing so he can cross-examine the affiant.

It is true that false facts cannot be considered when assessing probable cause. Under *Franks v. Delaware*, if a defendant makes a substantial preliminary showing that a search warrant affiant committed perjury or made a statement in reckless disregard for the truth, and without the offending statements probable cause cannot be shown, the Court may order a hearing where the defendant may cross-examine the affiant and challenge the validity of the search warrant. 438 U.S. at 155-56.

But both of those two showings must be made before a defendant is entitled to a *Franks* hearing. *United States v. Young*, 847 F.3d 328, 348-49 (6th Cir. 2017) (quoting *United States v. Pirosko*, 787 F.3d 358, 369 (6th Cir. 2015)). "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Franks*, 438 U.S. at 171. "The validity of an affidavit is presumed, and the burden lies with the challenger to prove the need for a hearing." *United States v. Reed*, --- F.4th ---, No. 24-5135, 2025 WL 3716262, at *6 (6th Cir. Dec. 23, 2025). "[I]f, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019) (quoting *Franks*, 438 U.S. at 171-72).

As to the first element, although the evidence suggests that Sgt. Kiousis's statements in the affidavit about the shot's trajectory were not substantiated, Luxon has not provided substantial evidence that Kiousis knew the statements were false or that he was reckless as to their truth or falsity.

It is true that there is no evidence to support Sgt. Kiousis's assertion that the shot was fired "in the direction of" the Livonia police officers. The reports of the ATF interviews with the three officers present at the scene — Holznagle, Zelenski, and Reinholtz — indicated that they believed that a shot was fired, but there is no evidence establishing the direction in which the shot was fired. The government cites reports from Sgt. Kiousis, Officer Reinholtz, and Officer Alsaedi to show that the Livonia police officers believed that they were being fired upon, *see* ECF Nos. 37-2, 37-3, but of the three individuals who prepared the reports, only Officer Reinholtz was present at the scene when the shot was heard. His report, just like his interview with the ATF agent, does not suggest that a shot was fired "in [his] direction" or at the other Livonia police officers, and he does not contend that he saw the shooter. *See* ECF No. 37-3, PageID.296. The report from Sgt. Kiousis merely reiterates the assertions in the search-warrant affidavit, and the report from Officer Alsaedi states that he "was advised by Sgt. Kiousis that a male fired a gunshot from the upstairs window," ECF No. 37-2, PageID.293, so neither secondhand report independently substantiates Kiousis's assertions about the trajectory of the bullet, or even that a shot was fired from the window. Moreover, the government admitted in an earlier hearing in this case that it could not substantiate the direction in which the shot was fired. ECF No. 27, PageID.56 ("I don't think there has been any information that is going to be able to say, specifically, whether the shot was fired in the air or in the direction of the officers."). So it is unclear what basis, if any, Sgt. Kiousis had to believe that the shot was fired "in the direction of" the police officers.

The defendant also attacks the assertion in the affidavit that the "unknown male" who shouted out of the window was the same person who fired the gunshot. *See* ECF No. 34-2, PageID.156. Such a fact is not supported by the firsthand accounts referenced by any of the parties. All three of the officers recalled *hearing* a gunshot, but none of them contend that they *saw* the

person who shot the gun. *See* ECF Nos. 34-3, 34-4, 34-5; ECF No. 37-3, PageID.296. Sgt. Kiousis's assertion that the person who shouted from the upstairs window was the same person who fired the shot also is unsubstantiated by the police officers' statements.

However, the government points out that Sgt. Kiousis interviewed the three Livonia police officers and learned that Officer Reinholtz heard someone shout at him and his colleagues when they were attempting to remove the GPS tracker from a car parked on the street, as Reinholtz stated in his report. ECF No. 37-3, PageID.296. The shout came from 13280 Hubbell Street. *Ibid.* He and his compatriots started running, and then he heard a sound "like a firearm chambering a bullet." *Ibid.* Then he heard a gunshot coming from that Hubbell Street address. In addition, Kiousis spoke with officer Alsaedi after Alsaedi interviewed defendant Luxon at the Hubbell Street house, and he learned that Luxon admitted to Alsaedi that he shouted from his upstairs window at the people in the street near the car. ECF No. 37-2, PageID.293. Kiousis also knew that the ShotSpotter technology indicated that a shot had been fired at the location of the defendant's residence at approximately the same time that the Livonia police officers purportedly were fired upon. *Id.* at 295. It is likely that Kiousis inferred that "an unknown male opened the upstairs window of the location, shouted at the undercover officers and fired one shot from a handgun, in the direction of" Zelinski and Reinholtz. ECF No. 34-2, PageID.156. He should not have written that statement in his affidavit. Rather, he should have stated the known facts and allowed the magistrate to draw the inference. However, Kiousis's embellishment does not support the argument that he advanced a "deliberate falsehood" or "reckless[ly] disregard[ed] . . . the truth." *Franks*, 438 U.S. at 171. Luxon's presentation here does not amount to a "substantial preliminary showing that the affiant *knowingly and intentionally, or with reckless disregard for*

*the truth*, included a false statement or material omission in the affidavit." *Young*, 847 F.3d at 348-49 (quoting *Pirosko*, 787 F.3d at 369) (emphasis added).

Even if the defendant's showing on the first element were satisfactory, he cannot satisfy the second element of *Franks* because after excising the challenged statements, the affidavit still supported the magistrate's probable cause finding. That alone would defeat his request for an evidentiary hearing. *Reed*, 2025 WL 3716262, at *6 ("[A] showing of intentional or reckless falsity does not necessitate a hearing if 'there remains sufficient content in the warrant affidavit to support a finding of probable cause' once the problematic material in the affidavit is set aside.") (quoting *Franks*, 438 U.S. at 171-72).

"Probable cause exists if 'the facts and circumstances are such that a reasonably prudent person would be warranted in believing that an offense had been committed and that evidence thereof would be found on the premises to be searched.'" *Peffer v. Stephens*, 880 F.3d 256, 263 (6th Cir. 2018) (quoting *Greene v. Reeves*, 80 F.3d 1101, 1106 (6th Cir. 1996)). The challenged assertions in the affidavit are limited to the statements that a shot was fired "in the direction of" the officers and that the person who fired the weapon was the same person who shouted at the officers. If these statements were stricken from Kiousis's affidavit, the first paragraph still would establish that a shot was fired in the presence of three undercover police officers, at or near the defendant's residence, immediately following shouting that came from the second floor of the residence. ECF No. 34-2, PageID.156. The uncontested portions of the affidavit also include statements that the defendant was present at his residence shortly after the shooting and that he had shouted at someone from his second-floor window, *ibid.*, strongly suggesting that he was the person who shouted at the officers and was present when the shooting took place. ShotSpotter confirmed that a shot was fired at the defendant's residence at the same time as the officers heard

the shot, and a state database showed that the defendant was convicted of felonies prohibiting him from possessing a firearm. *Ibid*. The magistrate did not need to conclude that it was the defendant who fired the shot to find probable cause to issue the search warrant; he only had to determine that it was likely that a firearm or other evidence of a fired shot would be found on the premises. Taking these facts together — and disregarding Sgt. Kiousis's unsubstantiated statements about the origin and the trajectory of the shot — a reasonable person could believe that a search of the residence would reveal that a gun or ammunition would be found at the house.

Luxon, citing *United States v. Garcia*, 20-606, 2021 WL 1964257 (N.D. Ohio May 17, 2021), argues that the magistrate's reliance on the ShotSpotter technology was error because independent reviews of the technology have shown that ShotSpotter alerts are not definitive evidence that a shot occurred at a particular location. However, *Garcia* suggested only that a ShotSpotter alert "*standing alone*, might only establish a speculative connection between the gunfire report and the [defendant's] residence." 2021 WL 1964257, at *2 (quotation omitted) (emphasis added). The *Garcia* court found that probable cause existed in that case because the ShotSpotter report was corroborated by other evidence, including an eyewitness account of the shooting. *Ibid.* The same is true here. The ShotSpotter report only serves as corroborating evidence of the gunshot that three police officers perceived firsthand. Even if the Court were to agree that ShotSpotter alerts by themselves do not establish probable cause, the excised affidavit would be sufficient to support the issuance of the search warrant because other evidence suggested that a shot was fired from or near the defendant's residence.

III.

The defendant has not made a substantial preliminary showing on either of the requirements that must be established to allow an evidentiary hearing to challenge the validity of the statements in the search warrant affidavit under *Franks v. Delaware*.

Accordingly, it is **ORDERED** that the defendant's motion for an evidentiary hearing so that he can cross-examine the search warrant affiant (ECF No. 34) is **DENIED.**

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: January 23, 2026